IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOHNNY ISENHOUR, III,** | : | **Civ. No. 1:14-CV-1170** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **OUTSOURCING OF MILLERSBURG, INC., 350 WICONISCO STREET OF MILLERSBURG, LLC, R.M.L., INC. d/b/a PlaySmart, and RML WAREHOUSING CORP.,** | : | |
| | : | **Judge Sylvia H. Rambo** |
| **Defendants** | : | |

# M E M O R A N D U M

In this Title VII action, Plaintiff has brought claims against his former employer for sexual discrimination, sexual harassment, hostile work environment, and retaliation. Presently before the court is Defendants' motion for summary judgment as to all claims. (Doc. 47.)  For the reasons stated herein, Defendants' motion will be denied in its entirety.

## I.      **Background**

In considering the instant motion, the court relied on the uncontested facts or, if the facts were disputed, viewed the facts and deduced all reasonable inferences therefrom in the light most favorable to Plaintiff as the nonmoving party. *See Doe v. C.A.R.S. Prot. Plus*, 527 F.3d 358, 362 (3d Cir. 2008).

A. **Facts**

Plaintiff Johnny Isenhour, III ("Plaintiff") is a thirty-seven year old veteran of the Armed Forces who was employed by Defendants from March 19, 2012 through June 19, 2012.[1]  (Doc. 79, ¶¶ 1-3.)  Defendants conduct the business of outsourcing administrative duties for a variety of clients, and maintain office or warehouse facilities at three locations in Millersburg, Pennsylvania: 100 Church Street, 151 Church Street, and 350 Wiconisco Street. (Koppenhaver Dep. at p. 20; Rempel Dep. at pp. 25, 55, 61.)  At all times relevant hereto, Plaintiff worked at the 100 Church Street location as an accounts receivable representative on the "PlaySmart" account for Defendant Outsourcing of Millersburg, Inc. ("Outsourcing") along with Bridget Machamer ("Ms. Machamer") and Leigh Finch ("Ms. Finch), who were both account managers.  (Doc. 79, ¶¶ 4-6, 8, 10; Isenhour Dep. at pp. 25, 32; Koppenhaver Dep. at pp. 32, 34, 43-44; Finch Dep. at p. 7.)  Account managers were responsible for providing account representatives with their job duties and supervising their work performance, and could discipline them when necessary.  (Koppenhaver Dep. at pp. 27, 55-56.)  Cortney Koppenhaver ("Ms. Koppenhaver"), also worked at the 100 Church Street location as the operations manager responsible for overseeing all of Defendants' operations and employees at all three locations.  (*Id.* at pp. 8, 20, 24-25.)  Ms. Koppenhaver's mother

---

[1]     As discussed in the court's memorandum of March 31, 2015, Plaintiff met with unnecessary resistance from Defendants in discerning who the proper defendants were in the instant action.  *See Isenhour v. R.M.L., Inc.*, Civ. No. 14-cv-1170, 2015 WL 1470679 (M.D. Pa. Mar. 31, 2015).  Due to Defendants' uncooperative behavior, it is unclear which exact entity employed Plaintiff, and such fact is disputed. Therefore, the court cannot make a finding as to the proper employer at this stage of the litigation. Accordingly, for purposes of convenience as it pertains to this memorandum, the court will generally refer to "Defendants" as Plaintiff's employer.

and immediate supervisor, Holly Jury ("Ms. Jury"), was the general manager for all of Defendants' locations, and Ivan Rempel ("Mr. Rempel") was the *de facto* owner of the businesses.  (Jury Dep. at pp. 7, 19-20, 33; Rempel Dep. at p. 77.)  While Ms. Jury maintained the authority to supervise all of Defendants' employees at their several locations, she did not directly supervise or even interact with Plaintiff during his employment with Defendants.  (Jury Dep. at pp. 19-20, 35-36; Rempel Dep. at p. 16.)  Similarly, Mr. Rempel only interacted with Plaintiff in passing, if at all, and did not directly involve himself in the daily operations of the business or regularly participate in the management or discipline of any employees.  (Rempel Dep. at pp. 22, 27, 30-31, 60.)

During his deposition, Plaintiff testified that, within the first month of his employment with Defendants, Ms. Koppenhaver and Ms. Finch began making unwelcome sexual remarks toward him.  (Isenhour Dep. at pp. 36-38.)  Specifically, Plaintiff testified that Ms. Koppenhaver and Ms. Finch regularly discussed the size of male employees' genitalia, including Plaintiff's, asked to see the size of his hands and shoes in order to determine the size of his penis, and, on at least one occasion, approached him with a ruler and attempted to measure his hand for the same purpose.  (*Id*. at pp. 37, 42, 92.)  Plaintiff further testified that such sexual behavior was part of the accepted culture within the office, as the other female employees would laugh during these incidents, discuss personal sexual experiences, and tell "dirty" jokes.  (*Id*. at pp. 39-40, 44.)

Amanda Frey, a former employee of Defendants, testified that Ms. Koppenhaver and Ms. Finch would regularly make sexual jokes and act overly flirtatious towards male employees.  (Frey Aff. at ¶ 7.)  Another former employee, Kevin Johnston, Jr. ("Mr. Johnston"), testified that he witnessed Ms. Koppenhaver and Ms. Finch routinely make sexual comments to male employees, including that they wanted to "tie them up and perform sexual acts on them."  (Johnston, Jr. Aff. at ¶ 13.)

Although such behavior was generally accepted in the office, Plaintiff testified that it made him uncomfortable and that he did not reciprocate the behavior, instead telling Ms. Koppenhaver and Ms. Finch "no thank you" when they would approach him, and turning red from embarrassment.  (Isenhour Dep. at pp. 40-42, 44.)  Mr. Johnston corroborated Plaintiff's testimony, stating that:

> [i]t was blatantly clear to anyone observing that [Plaintiff] was extremely uncomfortable with the conduct displayed towards him by Ms. [Koppenhaver] and Ms. Finch.  His displeasure was clear from the expressions on his face alone.  He in no way encouraged their inappropriate behavior towards him; quite the opposite, he tried to stem it whenever he could.  He was always informing them that he was not interested in them in that way.

(Johnston, Jr. Aff. at ¶ 11.)

Plaintiff further testified that such conduct occurred "a lot" during his employment with Defendants.  (Isenhour Dep. at p. 91.)  Mr. Johnston and Jessica Johnston ("Ms. Johnston") likewise testified that, "on a seemingly constant basis," they witnessed Ms. Koppenhaver make "multiple inappropriate sexual comments towards [Plaintiff] during

work hours," including comments "about his butt, his six-pack and his muscles." (Johnston, Jr. Aff. at ¶ 6; Johnston Aff. at ¶¶ 7-8, 10-11.)  Mr. Johnston further testified that he witnessed Ms. Koppenhaver "dancing and attempting to 'grind' up against [Plaintiff] while at work," and that he heard Plaintiff state "this really needs to stop, I have a girlfriend." (Johnston, Jr. Aff. at ¶ 7.)  On another occasion, Mr. Johnston witnessed Ms. Koppenhaver "smack[] [Plaintiff] on his butt," to which Plaintiff responded, "'don't touch me.'"  (*Id*. at ¶¶ 8.)  In support of his testimony, Mr. Johnston produced a photograph depicting Ms. Koppenhaver sitting on the lap of another subordinate male employee in one of Defendants' warehouses during work hours, which he described as Ms. Koppenhaver "writhing around on [the employee's] lap and bouncing up and down on him."  (*Id*. at ¶ 16; Doc. 52-12.)

Ms. Koppenhaver's and Ms. Finch's sexual comments toward Plaintiff were not restricted to the workplace.  Ms. Koppenhaver and Ms. Finch were friends as well as co-workers, and regularly socialized outside of work.  (Isenhour Dep. at pp. 37-38; Koppenhaver Dep. at p. 96.)[2]  Plaintiff testified that, outside of work hours, he received dozens of sexually explicit texts from Ms. Koppenhaver and Ms. Finch, as well as numerous calls.  (Isenhour Dep. at pp. 50-52, 90-91.)  Plaintiff testified as to the nature of the comments, stating that "[e]very time we talked, it's always the same song and dance.  You know, I am drunk.  Come fuck me.  You know, come – you can't handle pussy.  Oh, my

---

[2]   Mr. Johnston and Ms. Johnston testified that Ms. Koppenhaver and Ms. Finch would also socialize during work hours, such as by taking certain employees to a local bar to drink alcohol.  (Doc. 52-1, ¶ 21.)

God, you got to be gay.  You certainly are a faggot.  You suck dick." (*Id*. at pp. 55-56.)

Plaintiff produced one such comment that he received via text message on May 16, 2012

from Ms. Koppenhaver's cellular phone, which read, "[s]end me a picture of ur rod." (Doc.

52-11; Koppenhaver Dep. at pp. 15, 17; Isenhour Dep. at p. 57.)  Ms. Finch testified that she

was with Ms. Koppenhaver at the time the text message was sent and that she, not Ms.

Koppenhaver, sent the message.  (Finch Dep. at p. 12.)  Although Ms. Finch denied making

any other sexual comments to Plaintiff, Ms. Koppenhaver testified that she witnessed Ms.

Finch make sexual comments and send sexual text messages to Plaintiff, but that the

comments and messages occurred only outside of work.  (*Id*. at pp. 28-30; Koppenhaver

Dep. at pp. 95, 97, 103, 108-10.)

     Plaintiff further testified that, after consistently refusing to engage in any sort of

sexually explicit conversations or behavior with Ms. Koppenhaver or Ms. Finch, and

repeatedly asking them to "back off" and "let it go," (Isenhour Dep. at pp. 44-47, 50-51, 58-

59), he finally decided to report what he perceived as harassment to someone other than his

harassers (*Id*. at pp. 47, 49-50, 78-79; Machamer Aff. at ¶ 6).  He initially reported the

harassment to Ms. Machamer, another account manager in the PlaySmart group, as well as

Sherry Koppenhaver, who is Ms. Koppenhaver's mother-in-law, (Isenhour Dep. at pp. 47,

49-50, 78-79; Machamer Aff. at ¶ 6), and showed both of them some of the text messages he

had received, including the May 16, 2012 message.  Despite telling Ms. Machamer that he

was uncomfortable with the situation and that he had asked Ms. Koppenhaver to stop

(Isenhour Dep. at pp. 47, 49-50; Machamer Aff. at ¶ 6), Ms. Machamer did not take any action to assist Plaintiff with his complaint, instead telling him it might be best to "try to ignore it" (Isenhour Dep. at p. 49; Machamer Aff. at ¶¶ 6-7).

Following his refusal to send inappropriate pictures or engage in a sexual relationship with Ms. Koppenhaver or Ms. Finch, Plaintiff testified that they began to retaliate against him at work.  (Isenhour Dep. at pp. 74-76; Finch Dep. at pp. 23-24, 27-28; Machamer Aff. at ¶ 9.)  For example, although other employees, including Ms. Koppenhaver, regularly used the Internet for personal reasons, Ms. Finch suddenly began monitoring Plaintiff's computer use and instructed him not to use his personal email. (Isenhour Dep. at pp. 74-76; Finch Dep. at pp. 23-24.)  Ms. Finch subsequently created two formal write-ups detailing Plaintiff's computer use, despite never writing up any other employees for the same reason.  (Finch Dep at p. 25; Doc. 52-14.)  Additionally, Ms. Koppenhaver asked Ms. Machamer to create a memorandum documenting Plaintiff arriving late to work on June 15, 2012, despite never asking her to create such a memorandum in the past, and told her the reason for its creation was because such memorandums are kept in an employee's file in case they are terminated.  (Machamer Aff. at ¶ 9; Doc. 52-15.)  Mr. Johnston testified that he noticed a "discernible difference" in the way Ms. Koppenhaver treated Plaintiff near the end of his employment with Defendants as she became "very abrupt and short with him."  (Johnston, Jr. Aff. at ¶22.)

In early June of 2012, Plaintiff asked Ms. Machamer if he could take the day off on June 19, 2012, and she instructed him ask Ms. Koppenhaver, who approved his request. (Isenhour Dep. at pp. 69, 72-73, 84; Machamer Aff. at ¶ 8.)  The day before his scheduled day off, he reminded Ms. Machamer that he would not be at work the following day. (Isenhour Dep. at pp. 70-72.)  Nevertheless, on June 19, 2012, Ms. Koppenhaver called Plaintiff on the phone and informed him that his employment was terminated for a "no call no show" because he had only been approved for a half day off work.  (*Id*. at p. 70.)  Ms. Koppenhaver testified that she made the decision to terminate Plaintiff's employment with input from both Ms. Finch and Ms. Machamer, but both Ms. Finch and Ms. Machamer testified that they did not have any discussions with Ms. Koppenhaver regarding Plaintiff's termination.  (Koppenhaver Dep. at pp. 74-76; Finch Dep. at pp. 22, 33; Machamer Aff. at ¶ 15.)  Rather, Ms. Machamer testified that Defendants typically followed a progressive discipline policy and that Plaintiff had not been disciplined prior to the "no call no show." (Machamer Aff. at ¶¶ 10-11.)  Ms. Jury, Defendants' general manager, likewise testified that she could not recall another time in her more than twenty years of working for Mr. Rempel that an employee had been terminated for a single "no call no show."  (Jury Dep. at pp. 23, 38.)

## B.   <u>Procedural History</u>

Plaintiff initiated the instant action by filing a complaint against Defendant R.M.L., Inc. ("RML") on June 17, 2014.  (Doc. 1.)  On August 27, 2014, RML filed an

8

answer to the complaint, wherein it denied having ever employed Plaintiff or any of the purported discriminators referenced in the complaint (Doc. 8, ¶¶ 11-14, 16-17, 21; *see* Doc. 25-6, pp. 2-3 of 4), and indicated that it lacked sufficient information to admit or deny nearly all of the allegations contained therein (s*ee generally* Doc. 8; *see also* Doc. 25-6, p. 2 of 4).

Pursuant to standard case management practice, the court held a case management conference with counsel for the parties on October 14, 2014. (*See* Doc. 9.) During the conference, counsel briefly discussed RML's representation that it was not Plaintiff's employer and the court identified that same should be addressed as soon as possible, but noted that it would, nonetheless, issue a complete scheduling order later that day. In the order, the court set the deadline for joinder of parties and amendment of the pleadings as November 28, 2014. (*See* Doc. 13.)

On October 15, 2014, Plaintiff sent correspondence to RML seeking the proper identity of Plaintiff's employer as outlined in the complaint and included a notice of a designee deposition of RML.[3] (*See* Doc. 25-5.) In response, RML indicated that the vice president of RML, Mr. Rempel, would appear for the designee deposition, but that his answers to Plaintiff's questions would be based on memory alone because he was unable to locate RML's records. (*See* Doc. 25-6, p. 2 of 4.) As to Plaintiff's inquiry regarding his "proper employer," RML advised that Plaintiff could easily glean the answer from his W-2's,

---

[3]     In the letter, counsel requested that RML provide information regarding the proper identity of Plaintiff's employer without the need for unnecessary discovery and litigation on the issue (Doc. 25-5, pp. 2-3 of 63), and further referenced that RML's website holds out the individuals named as purported discriminators within Plaintiff's complaint as high level management within RML (*see id.* at p. 10 of 63).

which show that he "was paid by the employer known as 350 Wiconisco Street of Millersburg, LLC" ("350 Wiconisco"). (*Id.* at p. 3 of 4.) RML further stated that RML "had ceased operating as a business sometime ago and has absolutely no connection with 350 Wiconisco." (*Id.*)

On November 6, 2014, Plaintiff filed a motion to amend the complaint to add 350 Wiconisco as a defendant. (*See* Doc. 14.) In the motion, Plaintiff argued that RML and 350 Wiconisco were sufficiently interrelated and integrated in their activities, labor relations, ownership, and management that they may be treated as a single and/or joint employer for purposes of this action, and in support thereof produced numerous documents from the Internet evidencing that the two entities shared the same address and management team. (*Id.*) Pursuant to Local Rule 7.1, Plaintiff indicated that Defendant did not concur to the amendment. (*Id.*) Notwithstanding its non-concurrence, however, Defendant failed to file a response to the motion. (*See* Doc. 15.) On November 25, 2014, the court granted Plaintiff's motion as unopposed, noting that the resources of both the parties and the court could have been spared by Defendant's acquiescence if it did not have a good faith objection to the motion. (*Id.*) On November 26, 2014, Plaintiff filed his first amended complaint, thereby adding 350 Wiconisco as an additional defendant in this action. (*See* Doc. 16.)

On February 11, 2015, Plaintiff took the depositions of Mr. Rempel and Ms. Koppenhaver to ascertain the relationship between RML and 350 Wiconisco. (*See* Doc. 14, ¶ 16; Doc. 25-1, p. 5 of 14.) Although Mr. Rempel was highly evasive regarding his

knowledge of the operations and ownership of the three entities, his testimony suggested that the three entities exist for the purpose of running a single outsourcing business. (Rempel Dep. at pp. 47-48, 63-68, 75-76.) In pertinent part, Mr. Rempel testified that 350 Wiconisco has no day-to-day operations and instead serves only to supply employees to Outsourcing. (*See id.* at pp. 20-21, 24, 63.) Outsourcing, in turn, reimburses 350 Wiconisco for its payroll costs. (*See id.*) Although Mr. Rempel denied having any knowledge as to the approximate number of 350 Wiconisco employees that work for Outsourcing, he testified that employees for both entities operate at the same business locations. As for RML, Mr. Rempel testified that RML ceased its operations at some point in the past, though he does not know when, and is simply a d/b/a for Outsourcing of Millersburg.[4] (*Id.* at pp. 63-65.)

Relating to ownership, Mr. Rempel testified that he believes his wife owns 350 Wiconisco, but acknowledged that he asked his attorney to create the company.[5] (*Id.* at 20, 37-39.) Although he initially volunteered that he owns Outsourcing of Millersburg, he later testified that he is not sure if he owns it, but surmises that he does and is the only owner. (*Id.* at pp. 25-26.) He also expressed uncertainty as to whether he owns, or at any point

---

[4] More specifically, Mr. Rempel testified that "[t]here is no company called R.M.L.," but that he "believe[d]" it existed at one time. (Rempel Dep. at pp. 44-45.) Although he did not know who owned it, he testified that he may have been the owner and that his involvement with the company "probably would have been similar to [his] relationship with Outsourcing of Millersburg." (*Id.* at 45-46.) Acknowledging that his outsourcing business has changed its name over the years, Mr. Rempel conceded that RML "could have been one of the names. If it was, it was a long time ago." (*Id.* at 48.) He later testified that Outsourcing of Millersburg does business as RML because they "were hoping some of [their] existing customers would remember [them]" and because his attorney set it up that way. (*Id.* at pp. 63-64.)

[5] Mr. Rempel had previously represented in his interrogatory responses that he owned 350 Wiconisco. (*See* Doc. 25-7, p. 2 of 2.)

owned, RML,[6] but conceded that he "probably was" the president of the corporation.  (*Id.* at pp. 45-46, 67.)  While he admitted that the three entities share the same business locations, he denied having any knowledge as to the ownership of those properties.  (*See id.* at pp. 47-48, 54-56.)

Ms. Koppenhaver testified that as operations manager she has supervisory authority over the employees of both 350 Wiconisco and Outsourcing.  (*See* Koppenhaver Dep. at p. 25.)  Despite her position, she stated that she lacks a full understanding of the relationship between the two entities and is unaware of which employees worked for which company.  (*Id.* at pp. 46-47.)  She was, however, able to identify Plaintiff as a prior employee of 350 Wiconisco based on his W-2.  (*Id.* at pp. 45-46.)  When asked why Plaintiff's pay stub indicated that he worked for RML, Ms. Koppenhaver speculated that it was due to an error by their payroll service company.  (*Id.* at pp. 122-23.)  Mr. Rempel provided a similar response during his deposition, testifying that the pay stub was "prepared by a payroll service and they got it wrong."  (Rempel Dep. at p. 74.)

On February 18, 2015, Plaintiff filed a motion for leave to file a second amended complaint to add Outsourcing as a defendant in the action. (Docs. 25 & 25-1.)  In its memorandum of March 31, 2015, the court granted Plaintiff's motion, finding that Plaintiff met the requirements of the relation back doctrine under Federal Rule of Civil Procedure 15(c) and that the statute of limitations had therefore not expired as to Outsourcing.  *See*

---

[6]    The court notes that the Pennsylvania Department of State listed RML as an "active" corporation at the time of Mr. Rempel's deposition.  (*See* Doc. 31-2, p. 2 of 2.)

*Isenhour v. R.M.L., Inc.*, Civ. No. 14-cv-1170, 2015 WL 1470679, *4-6 (M.D. Pa. Mar. 31, 2015).  After filing his second amended complaint on March 31, 2015 (Doc. 35), the parties stipulated to a third amended complaint (Doc. 41) adding RML Warehousing Corp. ("RML Warehousing") as a defendant in the action, which was filed on June 2, 2015, and is the operative pleading in this matter.

After the parties engaged in discovery, Defendants filed a motion for summary judgment as to all claims, a brief in support thereof, and a statement of facts on July 30, 2015.  (Docs. 47-49.)  In their brief, Defendants argue that they should be awarded judgment on Plaintiff's sexual harassment and hostile work environment claims because Plaintiff failed to report the inappropriate conduct to a manager with authority to hire and fire employees, and because the complained of conduct either occurred outside of the workplace or was part of typical office banter not directed at Plaintiff.  (Doc. 48, pp. 6-9 of 14.)  Defendants further argue that Plaintiff's sexual discrimination and retaliation claims fail because Plaintiff's employment was terminated for legitimate, rather than discriminatory, reasons.  (*Id*., p. 11 of 14.)  Finally, Defendants argue that judgment should be awarded in favor of Defendants Outsourcing, RML, and RML Warehousing because none of those Defendants employed Plaintiff and Plaintiff has failed to establish that those Defendants were joint employers with Defendant 350 Wiconisco.  (*Id*., pp. 12-13 of 14.)

On August 20, 2015, Plaintiff filed an opposition brief, a counter statement of facts, and his own statement of facts.  (Docs. 52, 52-1, 52-2.)  The time for Defendants' reply has lapsed, and thus the motion is ripe for disposition.

## II.        Legal Standard[7]

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate when no genuine issue exists as to any material fact and when the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  A fact is "material" if "proof of its existence or nonexistence would affect the outcome of the lawsuit under the law applicable to the case."  *Burke v. TransAm Trucking*, *Inc.*, 605 F. Supp. 2d 647, 650 (M.D. Pa. 2009).  An issue of material fact is genuine if "the evidence is such that a reasonable jury might return a verdict for the non-moving party."  *Id.*

When considering a motion for summary judgment, a court must look beyond the pleadings and into the factual record.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  The nonmoving party may not merely restate allegations made in the pleadings or rely upon factually unsupported legal conclusions.  *See id.* at 323–24.  Instead, the nonmoving party must support each essential element of its claim with specific evidence from the record.  *Id.*

---

[7]     In their brief in support of their motion for summary judgment, Defendants incorrectly cite the legal standard related to Federal Rule of Civil Procedure 12(b)(6), which pertains to motions to dismiss.  (Doc. 48, pp. 4-5 of 14.)  Nonetheless, the court will apply the proper legal standard to a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.

at 317.  All factual doubts and reasonable inferences are to be resolved in favor of the nonmoving party.  *Id.*

The moving party has the initial burden of proving that no genuine issue of material fact exists.  *See id*. at 323.  Once this burden is met, the burden shifts to the nonmoving party to produce evidence proving the existence of every essential element to its case.  *Id.*  The nonmoving party must then "go beyond the pleadings by way of affidavits, depositions . . . or the like in order to demonstrate specific material facts which give rise to a genuine issue."  *Id.* at 324.  In considering a motion for summary judgment, the court is not to engage in credibility determinations or the weighing of evidence.  *Burke*, 605 F. Supp. 2d at 650.  Instead, when the credibility of witnesses is at issue or when conflicting evidence must be weighed, a trial is needed.  *Id.*

Defendants have moved for summary judgment, arguing that there are no genuine issues of material fact pertaining to any of Plaintiff's claims and that Defendants are entitled to judgment as a matter of law.

## III.      <u>Discussion</u>

Plaintiff has asserted claims for sexual harassment, hostile work environment, and retaliation pursuant to Title VII, as well as a similar state claim under the Pennsylvania Human Relations Act ("PHRA"), and a claim for punitive damages.  Under Title VII, it is unlawful "for any employer to fail or refuse to hire or to discharge any individual, or

otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1).  Because the standards governing Plaintiff's Title VII and PHRA claims are substantially similar, the court will analyze them collectively.  *See Burton v. Heckmann Water Res.*, Civ. No. 13-cv-0880, 2015 WL 1427971, *8 n.3 (M.D. Pa. Mar. 27, 2015) (citing *Daniels v. Sch. Dist. of Phila.*, 982 F. Supp. 2d 462, 478 (E.D. Pa. 2013)).

## A.   Hostile Work Environment

Defendants contend that the undisputed facts underlying Plaintiff's Title VII sexual harassment claims compel judgment in their favor because Plaintiff failed to report the harassment to a supervisor and the harassment was not severe or pervasive.  Title VII prohibits sexual harassment that is "sufficiently severe or pervasive 'to alter the conditions of [the plaintiff's] employment and create an abusive working environment.'"  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (citation omitted).  More specifically, a claim for hostile work environment requires a plaintiff to establish the following five elements: (1) the plaintiff suffered intentional discrimination because of his sex; (2) the discrimination was severe or pervasive; (3) the discrimination had a subjective detrimental effect on the plaintiff; (4) the discrimination was objectively detrimental; and (5) the existence of *respondeat superior* liability.  *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013) (citing *Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006)).  While the first four

16

elements establish a hostile work environment, the fifth element determines the employer's liability. *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009).

Defendants do not argue that the alleged discrimination against Plaintiff was based on his sex, or that it was not subjectively and objectively detrimental to him. Rather, Defendants argue that the discriminatory conduct was not severe or pervasive and that Plaintiff failed to report the harassment to "a manager or management with authority to hire and fire employees." (Doc. 48, pp. 6, 10 of 14.) The court will address these arguments in turn.

Defendants contend that Ms. Finch's and Ms. Koppenhaver's behavior was not severe or pervasive, but merely "typical office banter and that the Plaintiff was not singled out." (Doc. 48, p. 10 of 14.) To determine if conduct is severe or pervasive enough to support a claim for hostile work environment, a court must look to the "frequency of the discriminatory conduct; it's severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Mandel*, 706 F.3d at 168 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). "'Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to' a hostile work environment." *Benny v. Pa., Dept. of Corr., State Corr. Inst. at Somerset*, 211 F. App'x 96, 97 (3d Cir. 2006) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). Plaintiff has set forth sufficient evidence to establish a

claim for sexual harassment.  His testimony, which is corroborated by other witnesses, including Mr. Johnston, indicates that he was subjected to sexual comments and behavior from Ms. Finch and Ms. Koppenhaver "on a seemingly constant basis."  (Doc. 52-1, ¶¶ 54, 59-63.)  There is evidence that the two women repeatedly asked him about the size of his genitalia, approached him with a ruler, danced on him, and called and sent text messages asking for pictures of his genitalia, which establishes a pattern of conduct that a reasonable jury could find pervasive enough to support Plaintiff's hostile work environment claim.  Further, Plaintiff testified that he became embarrassed and turned red in the face when such conduct occurred (Doc. 52-1, ¶¶ 37, 43-45), which a reasonable jury could plausibly rely upon to conclude that the conduct was "physically threatening or humiliating."

Finally, Defendant's argument that other male employees experienced similar sexual harassment to what Plaintiff endured, and that Ms. Finch's and Ms. Koppenhaver's comments were part of the typical office banter actually supports, rather than opposes, Plaintiff's claim.  "'[I]ncidents involving employees other than [a] plaintiff are relevant in establishing a generally hostile work environment.'"  *Velez v. QVC, Inc.*, 227 F. Supp. 2d 384, 410 (E.D. Pa. 2002) (quoting *Hicks v. Gates Rubber co.*, 833 F.2d 1406, 1416 (10th Cir. 1987)) (alterations in original); *see also Mandel*, 706 F.3d at 167 (stating that "so-called 'me too' evidence" can be relevant where evidence is "closely related . . . to the plaintiff's circumstances.").  Here, Mr. Johnston testified that other male employees received comments about the size of their genitalia and their muscles, and the picture showing Ms.

Koppenhaver "writhing and bouncing" on a subordinate male employee's lap is similar to her attempting to dance and "grind" on Plaintiff, and is therefore relevant to Plaintiff's claim. Accordingly, a reasonable jury could find that Plaintiff suffered pervasive sexual harassment sufficient to support his hostile work environment claim, and Defendants are not entitled to judgment as a matter of law as to the third element of Plaintiff's claim.

Defendants' next contention is that judgment should be awarded in their favor because Plaintiff failed to properly report the harassment to a supervisor.  (Doc. 48, p. 6 of 14.)  While Defendants do not so expressly state, it would appear that their argument relates to the fifth element discussed above, namely the existence of *respondeat superior* liability. Relying on *Hafford v. Seidner*, 183 F.3d 506 (6th Cir. 1999), Defendants argue that a plaintiff must report the harassment to a manager in order for *respondeat superior* liability to attach to the employer.  However, this misconstrues the Sixth Circuit's opinion. Distinguishing between harassment by a co-worker and a supervisor, the *Hafford* court stated that an employer may be held liable for the harassment of a plaintiff's co-worker when the employer "knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action."  *Id*. at 513 (citation omitted).[8]  On the other hand, "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively

---

[8]     Although Defendants do not cite to any relevant Third Circuit precedent, the "knew or should have known" standard for establishing *respondeat superior* liability is the same in both the Third and Sixth Circuits.  *See Andrews v. City of Phila.*, 895 F.2d 1469, 1486 (3d Cir. 1990).

higher) authority over the employee" without any additional knowledge requirement on the part of the employer. *Id.* (citing *Faragher*, 524 U.S. at 777). "[A]n employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim." *Vance v. Ball State Univ.*, __U.S. __, 133 S. Ct. 2434, 2439 (2013).

Here, Plaintiff has alleged that Ms. Koppenhaver, who by her own testimony supervised Plaintiff (Koppenhaver Dep. at p. 55), and Ms. Finch, who had the authority to discipline Plaintiff and give him his daily job duties, sexually harassed him.  Ms. Koppenhaver further testified that, as operations manager, she was responsible for supervising all of Defendants' employees at their three Millersburg locations.  (Koppenhaver Dep. at pp. 25-26, 29.)  While Defendants dispute that Ms. Finch, and, somewhat incredibly, that Ms. Koppenhaver supervised Plaintiff (Doc. 79, ¶ 18), it is plausible that a jury could find that both Ms. Finch and Ms. Koppenhaver had supervisory authority over Plaintiff. Accordingly, Defendants are not entitled to judgment as a matter of law as to the fifth element required for Plaintiff's hostile work environment claim under Title VII.

## B.   Sex Discrimination

To prevail in a sex discrimination claim under Title VII, a plaintiff must show by a preponderance of the evidence that "'1) s/he is a member of a protected class, 2) s/he was qualified for the position s/he sought to attain or retain, 3) s/he suffered an adverse employment action, and 4) the action occurred under circumstances that could give rise to an

inference of intentional discrimination.'" *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  Here, Defendants do not dispute that Plaintiff is a member of a protected class based on his sex, that he was qualified for his position, or that he suffered an adverse employment action. Instead, Defendants argue that Plaintiff was discharged for a legitimate, rather than a discriminatory, reason.  In response, Plaintiff argues that Defendants' proffered legitimate reasons for his discharge are pretextual, and thus the familiar three-step burden-shifting analysis articulated in *McDonnell Douglas* applies.  *See Tolan v. Temple Health Sys. Transp. Team, Inc.*, 557 F. App'x 132, 136 (3d Cir. 2014).

Once a plaintiff satisfies the first requirement under *McDonnell Douglas* and establishes a *prima facie* case of discrimination, the burden shifts to the defendants "to articulate a legitimate, non-discriminatory reason for the adverse employment action."  *Id*. (citation omitted).  This "relatively light" burden does not require the defendants to "prove that the tendered reason actually motivated its behavior."  *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).  Rather, the defendants must merely introduce evidence which, if taken as true, "would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision."  *Id*.  Once the defendants have introduced such evidence, "the inference of discrimination drops and the burden shifts back to the plaintiff to show that the defendant's proffered reason is merely pretext for intentional discrimination." *Makky*, 541 F.3d at 214.

In support of their motion for summary judgment, Defendants argue that Plaintiff was terminated for legitimate, nondiscriminatory reasons; namely, that he was a "no call no show" for work on June 19, 2012, and that he was "a problem employee with numerous complaints," including personal use of a work computer, frequent unapproved trips to his vehicle during work hours, and poor performance of his job duties.  (Doc. 48, p. 11 of 14.) While these facts are disputed by the testimony of Plaintiff and Ms. Machamer, they would nonetheless, if taken as true, serve to meet Defendants' "relatively light" burden of articulating a legitimate, nondiscriminatory reason for Plaintiff's discharge.  Thus, the burden now shifts back to Plaintiff to establish the pretextual nature of Defendants' reasons for firing him.

In order to establish pretext, Plaintiff "'must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'"  *Burton v. Teleflex Inc.*, 707 F.3d 417, 427 (3d Cir. 2013) (quoting *Fuentes*, 32 F.3d at 764).  A plaintiff can attack the credibility of a defendant's reasons by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'"  *Tolan*, 557 F. App'x at 137 (quoting *Fuentes*, 32. F.3d at 765).

Here, Plaintiff testified that he had requested and received the full day of June 19, 2012 off of work, and therefore was not a "no call no show." Plaintiff further testified that he had not been disciplined or had any problems at work other than Ms. Finch directing him not to use personal email. (Isenhour Dep. at p. 73.) Ms. Machamer corroborated Plaintiff's version of events, testifying that he did request June 19, 2012 off from work, and that she never had any issues with him during his employment outside of a single, brief conversation regarding his frequent trips to his car. (Machamer Aff., ¶¶ 8, 10-12.) Ms. Machamer further testified that she believed Plaintiff was terminated in response to the accusations of sexual harassment he made against Ms. Finch and Ms. Koppenhaver, rather than the alleged "no call no show." (Machamer Aff., ¶ 14.)

Although Ms. Koppenhaver testified that she consulted with Ms. Finch and Ms. Machamer regarding her decision to terminate Plaintiff (Koppenhaver Dep. at pp. 74-75.), Ms. Machamer testified that she was not involved in the decision to terminate Plaintiff, and Ms. Finch testified that she did not even know whether Plaintiff was terminated or resigned. (Machamer Aff., ¶ 13; Finch Dep. at p. 33.)

Taken together, the differing versions of events leading up to Plaintiff's termination, along with the inconsistent explanations as to who was involved in making the decision to terminate his employment, could lead a reasonable jury to conclude that Defendants' proffered legitimate reasons for terminating Plaintiff are not credible. *See Twyman v. Dilks*, Civ. No. 99-cv-4378, 2000 WL 1277917, *7 (E.D. Pa. Sept. 8, 2000)

(finding that totality of evidence produced by plaintiff, including defendants' inconsistent explanations regarding who decided to terminate plaintiff, were enough to create a question for the jury).  Accordingly, the court finds that Plaintiff has met his burden in establishing that Defendants' proffered legitimate reasons for his termination may be pretextual, and Defendants are not entitled to judgment as a matter of law on Plaintiff's Title VII discrimination claim.

## C.   <u>Retaliation</u>

Plaintiff has also brought a retaliation claim under a pretext theory, and as such, it must be examined under the *McDonnell Douglas* burden-shifting analysis discussed above. *See id*. at *8 (citing *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997)).  To establish a *prima facie* case of retaliation under Title VII, Plaintiff "must show that (1) he engaged in protected activity; (2) the employer took adverse action against him; and (3) there was a causal connection between his protected activity and the adverse employment action."  *Reaves v. Pa. State Police*, Civ. No. 09-cv-2549, 2014 WL 486741, *4 (citing *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)).  In other words, Plaintiff must establish that his protected activity was a "but-for" cause of the adverse employment action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, __ U.S. __, 133 S. Ct. 2517, 2534 (2013).

At summary judgment, the court may consider "a broad array of evidence" to determine whether such causation exists. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 284 (3d Cir. 2000).  A short temporal proximity between the protected activity and an

adverse employment action that is "unusually suggestive" of a retaliatory motive may suffice to create an inference of causality. *Reaves*, 2014 WL 486741, *4 (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997)). Where the time between the protected activity and the adverse action is not unusually suggestive of retaliatory motive, a plaintiff may present evidence of antagonism by the employer towards the employee, inconsistent reasons for the adverse action, and any other evidence sufficient to establish an inference of retaliatory intent. *Id.* (citing *Farrell*, 206 F.3d at 280); *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232-33 (3d Cir. 2007).

Similar to Plaintiff's discrimination claim, Defendants do not dispute that Plaintiff engaged in protected activity when he complained of the harassment, or that he suffered an adverse employment action when he was terminated. Rather, Defendants argue only that there is no retaliation because they fired Plaintiff for legitimate reasons. Although courts within this Circuit have regularly found that gaps of one month or more between the protected activity and the adverse action to be too long to support an inference of retaliatory motive on their own, *see Thomas-Taylor v. City of Pittsburgh*, 605 F. App'x 95, 98 (3d Cir. 2015) (approximate one-month gap not unusually suggestive); *Carroll v. Clifford Twp.*, Civ. No. 12-cv-0553, 2013 WL 6244558, *6 (M.D. Pa. Dec. 3, 2013) (thirty-eight day delay not unusually suggestive); *Carmody v. Pa. State Univ.*, Civ. No. 05-cv-1645, 2007 WL 1074862, *8 (M.D. Pa. Apr. 9, 2007) (one-month delay not unusually suggestive), here, the close temporal proximity between Plaintiff complaining of the harassment to Ms. Machamer in

early June of 2012 and his termination on June 19, 2012 is "unusually suggestive" of a retaliatory motive.  Even if the temporal proximity, alone, were not enough to support an inference of retaliation, however, such an inference is further supported by the antagonism that Plaintiff experienced after making his complaint to Ms. Machamer.  For example, Plaintiff testified that Ms. Finch suddenly began commenting on his personal use of the Internet and email, despite personal use of computers being broadly accepted in the office.  Ms. Machamer testified that Ms. Koppenhaver requested that she create a memorandum on June 15, 2012, four days prior to Plaintiff's termination, documenting that Plaintiff was late for work, despite Ms. Koppenhaver never asking her to create a similar record of late arrivals in the past.  (Machamer Aff. at ¶ 9.)  In addition, Mr. Johnston testified that, near the end of Plaintiff's employment, Ms. Koppenhaver was "very abrupt and short with him."  (Johnston, Jr. Aff. at ¶ 22.)

Further supporting an inference of retaliation is the questionable legitimacy of Defendants' proffered final reason for Plaintiff's termination, that is, his "no call no show" on June 19, 2012.  While missing a day of work without notice may serve as sufficient cause for termination in other employment settings, Ms. Koppenhaver testified that Defendants followed the discipline procedures laid out in their employee policy, which would not have required termination in this instance; Ms. Machamer likewise testified that Defendants followed a progressive discipline policy; and Ms. Jury testified that in more than twenty

years of working with Mr. Rempel, she could not recall another time that an employee had

been fired after a single "no call no show."  (Jury Dep. at pp. 23, 38.)

Accordingly, the court finds that a reasonable jury could conclude that

Defendants' motives in terminating Plaintiff were retaliatory, and, therefore, Defendants are

not entitled to judgment as a matter of law in this regard.

### D.   <u>Single Employer for Title VII Purposes</u>

In conjunction with their substantive attacks on Plaintiff's claims, Defendants

have also moved for summary judgment as to Defendants Outsourcing, RML, and RML

Warehousing because they were not Plaintiff's actual employers and should not be

considered a single employer with 350 Wiconisco.  (Doc. 48, pp. 12-13 of 14.)  Plaintiff

argues in response that Defendants should be considered a single employer under the

"integrated enterprise test."  (Doc. 52, p. 39 of 53.)

The "integrated enterprise" or "single employer" test was created by the National

Labor Relations Board for use in labor disputes, and uses the following four factors to

determine whether two or more entities constitute a single employer: "(1) interrelation of

operations, (2) common management, 3) centralized control of labor relations, and (4)

common ownership or financial control."  *Nesbit v. Gears Unlimited, Inc.*, 347 F.3d 72, 84

(3d Cir. 2003) (quoting *Artis v. Francis Howell N. Band Booster Ass'n, Inc.*, 161 F.3d 1178,

1184 (8th Cir. 1998)).  While several circuits have adopted the use of the integrated

enterprise test to determine whether multiple entities constitute a single employer with

27

regard to claims brought under Title VII, the Third Circuit has adopted its own slightly different test.  *See id.*  To determine whether multiple entities should be considered a single employer for Title VII claims, the Third Circuit focuses on "the degree of operational entanglement—whether operations of the companies are so united that nominal employees of one company are treated interchangeably with those of another."  *Id*. at 87.  The relevant factors for determining operational entanglement "include: (1) the unity of ownership, management, and business functions; (2) whether the entities present themselves as a single entity to third parties; (3) whether the parent company indemnifies the expenses or losses of its subsidiary; and (4) whether one entity does business exclusively with the other."  *Plaso v. IJKG, LLC*, 553 F. App'x 199, 206 (3d Cir. 2014) (citing *Nesbit*, 347 F.3d at 87).

In applying the above factors to Defendants, the court finds that the evidence of record is more than sufficient for a jury to conclude that Defendants "are united in ownership, management, [and] purpose" and constitute a single employer for purposes of Plaintiff's claims.  *Id*.  As to the first factor, Mr. Rempel, despite being highly evasive during his deposition regarding his knowledge of the operations and ownership of Defendants, appears to be either the actual, or at least *de facto*, owner of all Defendants.  Mr. Rempel initially stated in his response to interrogatories that he owned 350 Wiconisco, but later testified that he thought his wife was the owner.  (Rempel Dep. at pp. 20, 37-39.)  He further testified that he was likely the owner of Outsourcing, and, although he was unsure if he ever owned RML, he was likely the president.  (*Id*. at pp. 25-26, 45-46, 67.)  Finally, he testified

that, to the best of his knowledge, he owns RML Warehousing.  (*Id*. at p. 113.)  Mr. Rempel also testified that at least three of those entities exist for the purpose of running a single outsourcing business.  (*Id*. at pp. 47-48, 63-68, 75-76.)  In addition, the testimony of Mr. Rempel, Ms. Jury, and Ms. Koppenhaver establishes that they were responsible for the management and oversight of all the employees of each defendant at each location in Millersburg.

As to the second factor, Defendants are all presented to the outside world as the single entity "RML" via the website available at http://rmlsite.com.  Mr. Rempel indicated that, while it appears to be a website for RML, it is "really a website for Outsourcing of Millersburg, d/b/a [RML]" because "Outsourcing of Millersburg is the company that performs these functions."  (Rempel Dep. at p. 75.)  He further testified that the business entity name "Outsourcing of Millersburg" does not appear anywhere on the website "[b]ecause that's not a name anybody would know."  (*Id.* at p. 76.)

Regarding the third and fourth factors, Mr. Rempel testified that 350 Wiconisco has no day-to-day operations and instead serves only to supply employees to Outsourcing.  (*See id.* at pp. 20-21, 24, 63.)  Outsourcing, in turn, reimburses 350 Wiconisco for its payroll costs.  (*See id.*)  He further testified that employees for both entities work at the same business locations.  With regard to RML Warehousing, Mr. Rempel testified that it has no active business operations, and its sole function is to receive funds from Outsourcing in

order to pay for small operating expenses – such as holiday parties and gas money – for employees of 350 Wiconisco.  (*See id*. at pp. 113-15.)

Based on the testimony of the owner and management for Defendants, the court finds that there is at the very least a genuine issue of material fact as to whether Defendants maintained such a "unity of ownership, management, and business functions" that they could be considered a single employer for purposes of Plaintiff's claims.  Accordingly, Defendants Outsourcing, RML and RML Warehousing are not entitled to judgment as a matter of law as to Plaintiff's claims.

### E.    Punitive Damages

Lastly, Defendants argue that they are entitled to judgment as a matter of law as to Plaintiff's claim for punitive damages because Plaintiff has failed to produce any evidence to support his claim and because punitive damages are not permissible under the PHRA. (Doc. 48, p. 13 of 14.)  First, Plaintiff has brought his claim for punitive damages pursuant to his Title VII claims only, not the PHRA, and therefore Defendants' argument regarding the permissibility of punitive damages under the PHRA is irrelevant and need not be addressed by the court.  Second, neither Defendants nor Plaintiff have bothered to make any argument as to what type of showing is necessary to support a claim for punitive damages under a Title VII claim, and the court does not feel compelled to brief the issue for the parties.  However, the court notes that a Title VII claim can support an award of punitive damages where the plaintiff shows that an employer "intentionally discriminated with malice or reckless

indifference to [his] federally protected rights." *Standen v. Gertrude Hawk Chocolates, Inc.*, Civ. No. 11-cv-1988, 2012 WL 3288916, *12 (M.D. Pa. Aug. 10, 2012) (citing *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999)).  Without rehashing the facts stated herein, there is sufficient evidence in the record that Plaintiff may be able to establish at trial the required malice or reckless indifference to support his claim for punitive damages. Accordingly, Defendants are not entitled to judgment as a matter of law as to Plaintiff's punitive damages claim.

## IV.      Conclusion

In conclusion, the court finds that a reasonable jury could conclude that Plaintiff suffered a hostile work environment, discrimination based on his sex, and retaliation for his complaints of sexual harassment by Ms. Finch and Ms. Koppenhaver.  The court also finds that a reasonable jury could conclude that Defendants were a single employer for purposes of Plaintiff's claims, and that the facts in the record may support an award of punitive damages against Defendants.  Therefore, the court will deny Defendants' motion for summary judgment in its entirety.

An appropriate order will issue.

 s/Sylvia H. Rambo
 United States District Judge

Dated: October 26, 2015

31